THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICHARD QUINLAN, Defendant-Appellant.

First District (3rd Division)   No. 1—90—0255

Opinion filed June 10, 1992.

Rita A. Fry, Public Defender, of Chicago (James H. Reddy, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

After a bench trial, defendant, Richard Quinlan, was convicted of criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—13(a)(2)) and sentenced to 18 years' imprisonment. On appeal, defendant asserts that the evidence did not prove beyond a reasonable doubt that the victim was unable to give knowing consent and did not understand the nature of the acts. We affirm. The issue in this case is whether an illegitimate medical examination is covered by the criminal sexual assault statute and is a commission of a criminal act.

On November 11, 1988, D.S., a 26-year-old woman, was admitted to Humana Hospital in Hoffman Estates, Illinois, suffering from pneumonia and dehydration. D.S., who had bachelor's and master's degrees in psychology with some training in child sexual abuse, had suffered from respiratory problems most of her life. Defendant was employed as a respiratory therapist at the hospital and was assigned to D.S.'s case.

On the first day of D.S.'s hospitalization, defendant came into her room three or four times. Each time he asked D.S. questions about her medical history or explained the treatments to be administered. Defendant administered a respiratory treatment on that first day.

The next day, defendant came to see D.S. in the late afternoon. He told her that he had discussed her case with his colleagues and asked more specific medical questions, including questions relating to a vaginal yeast infection. Defendant asked D.S. how far she was willing to go to solve her medical problems. He related a story about another woman patient who told him that she was willing to go under a microscope to solve her medical problems. Defendant asked D.S. if she was willing to go that far. Frustrated, D.S. told defendant she would be willing to undergo whatever medical tests were necessary to make her feel well. Defendant left the room, stating that he was going to consult some colleagues.

Defendant returned to D.S.'s room about two hours later and administered a respiratory treatment. He then indicated that he and his boss had come up with a medical test that would help get at the root of D.S.'s problems. When D.S. asked about the identity of defendant's boss, defendant was evasive. When D.S. asked again, defendant responded that his boss was Dr. Hollan from Lutheran General Hospital. Both sides stipulated that no Dr. Hollan was on staff at Lutheran General Hospital in November 1988. Defendant asked more questions and left.

About 7 p.m. that same night, defendant returned and asked D.S. more questions. He then told D.S. that his boss (Dr. Hollan) had decided that the cardio-pulmonary-respiratory examination, or C.N.R. test, was her best option. Both sides stipulated that there is no such procedure as a C.N.R. test relating to respiratory therapy.

Defendant told D.S. that there were three ways to administer the C.N.R. test. While the first way did not apply to D.S., the second was a modified test, and the third was invasive. When D.S. asked about the modified test, defendant stated that it looked at "profusion," which he explained only as blood and circulation. Defendant then explained that the invasive C.N.R. consisted of rectal and vaginal penetration to determine if the muscles were contracting properly to see if the patient was neurologically intact.

When D.S. indicated that she preferred the modified C.N.R., defendant responded that the invasive C.N.R. was in her best interest if she wanted to get to the root of her problems. D.S. told defendant that she wanted to consult with her primary physician, Dr. Round, but defendant said that her case had been referred to the pulmonology department, had been taken off Dr. Round's caseload, and that defendant and his boss (Dr. Hollan) were handling her case.

Near the end of that conversation, D.S.'s parents entered the room. Defendant briefly discussed the C.N.R. test with them, but did

not elaborate about the invasive procedure. After defendant left, D.S. generally discussed the tests with her parents, but did not go into detail.

Around 10 p.m. that night, defendant again came into D.S.'s room to administer a respiratory treatment. When he finished, he asked D.S. if she had decided about the C.N.R. test. D.S. was unsure and asked whether it would give her the answers she needed. When defendant replied that the test was in her best interest, D.S. agreed to have the test performed. Defendant then told D.S. to remove all her clothes except her hospital gown and he would order the test.

Defendant left and returned five minutes later. When D.S. asked him how many times he had performed this test, he responded "maybe 200." Defendant then instructed D.S. to roll over on her right side and pull her knees to her chest. He then began to examine her rectal area, supposedly to check for "profusion." Defendant inserted a metallic object into D.S.'s rectum and asked her to contract and release her muscles. After removing the object, defendant inserted one finger and then more than one finger into D.S.'s rectum and had her repeat the process.

Defendant then told D.S. to turn over on her back and spread her legs, again telling her that he was going to check for "profusion." Defendant began touching her vaginal area and said, "Boy, you certainly are saturated now, aren't you?" He then inserted one finger into her vagina and asked her to contract and release her muscles. Defendant asked D.S. if he could insert fingers into her rectum and vagina simultaneously, but D.S. refused. Defendant then pinched D.S.'s vaginal area, stroked the bottom of her feet, checked her cuticles for circulation, and told her he was finished.

Before defendant left, D.S. asked if Dr. Round would receive a copy of the report. Defendant replied that the report would be in her file the next day. D.S. cleaned herself off, then called her apartment. She spoke with her roommate and her parents. She told them that she felt violated, humiliated, and uncomfortable with the examination. Her parents encouraged her to speak with Dr. Round.

The next day, D.S. asked Dr. Round about the results of the test. Dr. Round informed D.S. that he did not order such a test. After questioning her about the test and who performed it, Dr. Round left, stating that he would check into it. The following morning, Dr. Round and the head nurse questioned D.S. about the details of the C.N.R. exam. Dr. Round explained to D.S. that she had been a victim. At trial, D.S. testified that she would not have allowed the incident to occur if she did not think it was a legitimate medical test.

Defendant asserts that his conviction must be reversed because the evidence did not prove him guilty beyond a reasonable doubt since D.S. was an intelligent, educated woman who understood the proposed acts and knowingly consented to them. Furthermore, defendant argues, the statute's consent language has been applied historically to victims of a young age or of diminished mental capacity.

The State responds that defendant's acts violated both the language and the intent of the statute. Defendant took advantage of D.S.'s frustration over her illness and her reliance on him as a medical professional assigned to her case, the State argues. D.S. consented to a medical test, not to acts of sexual penetration. D.S.'s consent is vitiated, the State claims, because it was received through deceit.

■ We agree. Defendant was convicted of criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—13(a)(2)), which provides that:

"The accused commits criminal sexual assault if he or she:
***

(2) commits an act of sexual penetration and the accused knew that the victim was unable to understand the nature of the act or was unable to give knowing consent." Ill. Rev. Stat. 1987, ch. 38, par. 12—13(a)(2).

Knowing consent "presupposes an intelligence capable of understanding the act, its nature and possible consequences." (*People v. Blunt* (1965), 65 Ill. App. 2d 268, 274.) Even though D.S. is an intelligent, educated woman, she is not a doctor or a trained respiratory therapist. She had no way of knowing that the proposed examination was not a legitimate medical test, but relied on the medical professional who was assigned to her case in a reputable hospital. D.S. consented to an invasive medical procedure, not to sexual acts. Since defendant's acts were not a medical procedure, the evidence proved beyond a reasonable doubt that D.S. did not understand the nature of the acts and did not give knowing consent.

Furthermore, the evidence proved beyond a reasonable doubt that defendant knew that D.S. was unable to understand the nature of the acts or to give knowing consent. There were numerous conversations and questions where D.S. showed concern and an uncomfortableness with the invasive procedure. It was only after defendant used deceit to convince D.S. that the test would get to the root of her medical problems that she consented.

■ Moreover, the State legislature exempted legitimate medical tests from the criminal sexual assault statute. (*People v. Foster* (1990), 195 Ill. App. 3d 926, 953.) Section 12—18 of the Criminal Code of 1961 provides that exemption to the statute:

26

"(b) Any medical examination or procedure which is conducted by a physician, nurse, medical or hospital personnel, parent, or caretaker for purposes and in a manner consistent with reasonable medical standards is not an offense under Sections 12—13, 12—14, 12—15 and 12—16 of this Code." Ill. Rev. Stat. 1987, ch. 38, par. 12—18(b).

■ This section evidences a legislative intent that illegitimate medical examinations are covered by the criminal sexual assault statutes. Since defendant's acts were not part of a legitimate medical examination, defendant was proved guilty beyond a reasonable doubt.

Based on the foregoing, defendant's conviction is affirmed.

Affirmed.

GREIMAN, P.J., and RIZZI, J., concur.