FOURTH DIVISION

No. 1-07-1542

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 06 MC 3007145 |
| | ) | |
| BRADLEY HAYASHI, | ) | Honorable |
| | ) | Kay Marie Hanlon, |
| Defendant-Appellant. | ) | Judge Presiding. |
| | ) | |

JUSTICE GALLAGHER delivered the opinion of the court:

Defendant Bradley Hayashi was charged with one count of battery for fondling the complainant's breasts and vagina during a full body massage at his chiropractic office. Following a bench trial, he was convicted and sentenced to 10 days in jail and 12 months' probation, and assessed fines and costs. On appeal, defendant contends the State failed to prove its case beyond a reasonable doubt. Defendant further contends he was entitled to the physician exemption codified at section 12–18(b) of the Criminal Code of 1961 (720 ILCS 5/12–18(b) (West 2006)) and the State failed to sustain its burden under this exemption. For the reasons that follow, we affirm.

BACKGROUND

On October 16, 2006, Melina Kelley went to the Midwest Chiropractic Office in Hanover Park, a business owned by Hayashi, a licensed chiropractor. Kelley had been a patient of Hayashi's for approximately two years. During that time, she had two to three appointments each week to treat her scoliosis. Her treatments consisted of chiropractic adjustments, massage therapy and electrical stimulation therapy. Hayashi performed the chiropractic adjustments and other employees usually performed the massage and electrical stimulation therapies.

On the 16th, Kelley had an appointment for a full body massage and also an adjustment and electrical stimulation. She had never had a full body massage at the Midwest Chiropractic Office prior to that date. Her regular massage appointments were for 20-minute therapeutic back massages on the areas that were affected by her scoliosis. The regular massages were usually administered by Valerie Taft, one of Hayashi's employees.

Kelley testified that she had originally scheduled a full body massage before her wedding in May 2006, because Hayashi told her he did that massage for all of his brides-to-be and he wanted her to have it. However, she ended up going to a spa for some other treatments and the package included a massage, so she cancelled the May appointment with Hayashi and rescheduled for October. She further testified that Hayashi told her he was the only one who did full body massages at his clinic, and that is why she scheduled the appointment with him. Kelley trusted Hayashi and had sent him an invitation to her wedding.

When Kelley arrived for the appointment, she was not immediately taken into the massage room so she testified that she made her next regular appointment while she was waiting.

1-07-1542

When Hayashi took her back to the massage room, he told her this massage was going to be different from any of the previous massages she had received at the clinic. He then told her to completely disrobe and lie facedown on the table. She asked if she needed to remove her socks as well and he told her she should because he would also be massaging her feet.

Hayashi then left the massage room. There are usually two sheets on the table, one covering the table and one that is used as a top sheet for the patient to get underneath. However, Kelley testified that this time there was only the sheet covering the table and a small hand towel. Kelley undressed and lay facedown on the table, using the small towel to cover her buttocks. She testified that she had never had a full body massage from a doctor before and did not know what to expect.

Hayashi reentered the room without knocking and asked if there was anything she did not want him to do. Kelley said he should do whatever he normally does. Hayashi replied that on women he usually massages the pelvic area. Kelley did not know what he meant by that, so she again said she wanted him to do whatever he normally does.

Hayashi began the massage on her left calf, after first spreading her legs apart. Kelley testified that he spread them apart so far that she could feel her butt cheeks separating. After massaging her left calf, he moved up to the hamstring area. He then moved the towel, exposing her left buttock, and began to massage the buttock. As he did so, his fingers would go into the crease between her buttocks.

Hayashi then began to massage Kelley's left thigh, and every time he moved his hand up, he would brush her vagina. Kelley began to feel very uncomfortable. She testified that she did

3

not know if she should question him or if maybe he did not mean to do that and she had just gotten in the way. But then she noticed that it would happen every time he massaged her inner thigh. It happened two to three times on her left thigh, and an additional three times when he massaged her right thigh.

During the massage, Hayashi made small talk about Kelley's family. He also mentioned that he would bring in a bottle of one of his favorite wines when she had her next appointment. Kelley testified that she did not really say much in response because she was feeling nervous and scared. She said she felt very uncomfortable but did not know if this was normal practice for a full body massage by a doctor. She also felt that she should not question what a doctor is doing.

When Hayashi began massaging Kelley's back, he bumped into her elbow which was bent and protruding slightly over the edge of the table. Kelley testified that it felt like he bumped her elbow with his erect penis, and that although she was lying facedown and could not see him, she could tell the difference between how a leg would feel and how an erect penis would feel.

After the back massage, Hayashi asked Kelley to turn over and held the small towel up so she could turn. She turned over and he placed the towel back on her. Kelley testified that the towel was so small it barely covered her chest and vagina. She said that she kept her eyes closed the entire time because she did not want to see him looking at her while she was naked. Hayashi began massaging her left leg below her knee, then moved up to massage her left thigh. He moved the towel so that her left side was exposed and began massaging her bikini area and then started massaging her labia. This went on for a few minutes.

Kelley said that he would massage her bikini area and then prod her labia and ask if that

4

hurt. She told him that it did not hurt, but testified that she was scared and was becoming increasingly uncomfortable. At the same time, she was too embarrassed to say anything because she thought he would just tell her that is how the massage is supposed to be done. She thought that perhaps some women feel pain there and need to be worked on in that area.

Hayashi then moved to massage her lower stomach, and Kelley was so uncomfortable that she told him she had to go to the bathroom even though she did not. He said she could go to the bathroom and come back, and Kelley decided that she did not want to have to come back in and undress again, so she told him that she would just wait. Hayashi responded that he was only halfway done and Kelley told him that she just did not feel like getting dressed and undressed. He told her that she could wear a gown and she said she was not comfortable walking around in a gown, so he suggested wearing two of them and putting one of them on backwards. Hayashi left the room and returned with two gowns.

Kelley went to the bathroom and then went back to the massage room and quickly undressed and got under the small towel again because she did not know when he was coming back in. When Hayashi returned, he moved the towel and started massaging her lower stomach again. He then said he wanted to work on her upper body and moved the towel so that it was only across her mid-section. He massaged both her left and right breast for several minutes each. During this time, Hayashi brought up Kelley's previous breast reduction surgery and asked if she had any sensitivity left from the surgery. Kelley responded that she only had some sensitivity.

Hayashi then went to the head of the table and sat down while he massaged her neck and scalp. He left the towel across her mid-section, and Kelley testified that she wanted to cover

herself up but was embarrassed to have him know what she was doing. She slowly moved the towel up to cover herself, and as soon as she was again covered, he stood up and said he was finished with the neck and scalp.

Hayashi told Kelley he was going to work on her lower body again. Kelley testified that she still had her eyes closed. She could hear him putting more oil on his hands, and then he told her that this was going to get her endorphins going and make her feel the way she feels after she has had sex. Hayashi touched her clitoris and started massaging and rubbing it. She said this went on for a couple of minutes and then he asked if she was okay. Kelley was embarrassed and scared but felt like she had to say something to get him to stop so she said she was not okay. Hayashi asked what was wrong, and Kelley said she was really cold.

Hayashi left the room and returned with a small blanket. He asked her again if she was okay and she said no, she wanted to skip that part. He asked if she was sure, and she repeated that she wanted to skip that part. Hayashi said he did not want her to think he was hitting on her and that this was very clinical and would help her lower back. Kelley said she did not think he was hitting on her but she was just not comfortable with that.

Kelley testified that Hayashi was acting confused as if he did not understand why she was uncomfortable. He asked if she wanted him to work on her neck instead. She said yes and he started working on her neck and scalp again. He asked again if she was okay and she said she was fine. Hayashi then said he did not want her to walk out of the clinic "all weirded out." Kelley said she understood and that it was okay. After working on her scalp for a few more minutes, Hayashi stood up and said he was done. He told her she could get dressed and go into

the other room for the electrical stimulation therapy.

Kelley got dressed and walked out of the massage room. She walked past the electrical stimulation room because she did not want the stimulation therapy. She testified that she just wanted to get out of there and the stimulation therapy would take another 20 minutes. Hayashi was in another room adjusting a patient and saw her walk past the room. He asked if she was going to get the stimulation and she said she was not. He told her to wait in the waiting room for her adjustment and he would be there as soon as he finished with the other patient.

Kelley testified that she sat in the waiting room, feeling as if she had done something wrong. She did not want the receptionist to see her upset so she tried to act as if everything was normal. Hayashi came out in a few minutes and told her to come back for her adjustment. While he was doing the adjustment, he told her that if she was not ready to get pregnant yet she should not have sex with her husband that night. He said that she was all relaxed from the massage and it is easier to get pregnant when you are relaxed. He told her that even the "pre-come" could get her pregnant. Kelley did not respond and left the office as soon as the adjustment was finished.

On her way home, Kelley stopped at her parents' house to drop something off, but nobody was there so she continued home. She tried calling a friend but got her voice mail. Kelley's house is about 25 minutes from the clinic. When she pulled into the garage, she hit the wall with the car because she was so upset. Her husband was still at work. She went inside and went straight to the bathroom to take a shower, even though she had just showered and put on clean clothes a few hours earlier.

After talking on the phone with a friend and her mother, Kelley started to realize that

something bad had happened to her at the clinic. She went to the police station about five or six hours later with her husband and sister-in-law and filed a complaint against Hayashi.

Hayashi testified that when he took Kelley back to the massage room and told her to disrobe, she told him she was cold. He said that he gave her a bath towel and then left the room to get a hot pad to put on her back. He further testified that there were two sheets on the massage table. When he returned to the room, he said she was lying facedown on the table on top of both sheets and had the bath towel across her back covering her down to mid-thigh.

Hayashi said he rearranged the towel so that it was lengthwise and then placed the hot pad on Kelley's back. Hayashi testified that he began by massaging Kelley's legs and went up her thigh to a point about five inches below the gluteal region. He said he did massage her buttocks but his fingers never went in the crease between the buttocks. Hayashi further testified that he never touched Kelley's vaginal area or labia. He said he never got closer than within five inches of the genital area because the towel was always covering that area.

After massaging Kelley's back, Hayashi held up the towel so she could flip over onto her back. He said he was planning to start on her lower legs, but Kelley asked if she could go to the bathroom. He told her that it was a good stopping point because he was about halfway done, and testified that he offered to go and get two gowns so that she would not have to get dressed again. Hayashi then left the room for five minutes to do an adjustment on another patient.

When he returned, Kelley told him that she was cold so he got another hot pack. Hayashi testified that he massaged the front of both legs, again stopping five inches below the vaginal area. He then moved to her neck because he was starting to run short on time and had other

patients waiting. He said he also worked on the pectoral region, where the breasts are located, for a few minutes at most. Hayashi said that patients with scoliosis tend to have tight muscles in the pectoral region and that is why he massaged that area on Kelley.

Hayashi testified that he never touched Kelley's clitoris and that Kelley did not tell him at any time that she was uncomfortable. He said that he finished the massage with the neck and scalp area and then left to adjust another patient. He then came back to the room and Kelley was just leaving, so he asked if she wanted to do the electrical stimulation therapy while he treated his next patient. Kelley said she would skip the stimulation, so he took her back to the waiting room. He returned after he finished with the other patient and took her back for her adjustment. He said that Kelley did not seem upset or uncomfortable.

On cross-examination, Hayashi testified that he did not know of any type of massage in which the vaginal area would not actually be touched but the patient would feel as if someone was groping her vagina. Hayashi also testified that approximately one month before the massage, Kelley told him she was going to stop taking birth control pills and wondered if it would be easier or harder to get pregnant after going off the pill. Hayashi told her there were two schools of thought on the subject and that if she had any difficulty getting pregnant, there were other alternatives involving pressure points as part of a lumbar adjustment. He then joked that she could also just have a massage and a bottle of wine because that had worked for his wife.

Nancy Hallgren, a massage therapist who works for Hayashi, testified that a full body massage does not include any contact with the vagina and would only include contact with the breasts if the patient complained of any type of pain or discomfort there. Hallgren further

testified that while massaging one area, there could be a transfer of feeling to muscles in another area, giving a tingling sensation or a feeling of pain. She described it as a traveling sensation that could go up or down the leg. She also said that massaging the inner thigh could trigger sensations in the vaginal area but that it would not feel like the vagina was being rubbed or touched.

Valerie Taft, a massage therapist formerly employed by Hayashi, testified that it was common to feel a sensation in one part of the body while touching another part. She called it "referral pain." Taft further testified that she did not know of any body part that could be touched that would cause a woman to feel as if she was being massaged or rubbed in her vaginal area without anyone actually touching her there.

Karen Muir, Hayashi's receptionist, and Bernice Musgrave, the office manager, also testified. Both of them testified to the doctor's good reputation and both said that Kelley made her next appointment after the full body massage while she was waiting for her adjustment.

Hayashi waived his right to a jury trial. The trial court judge found him guilty of one count of battery and sentenced him to 10 days in the Cook County Department of Corrections and 12 months' probation. This appeal followed.

ANALYSIS

Defendant first contends that the physician exemption codified at section 12–18(b) (720 ILCS 5/12–18(b) (West 2006)) applies to Hayashi because simple battery is a lesser included offense of rape. Defendant argues that the burden was on the State to establish beyond a

reasonable doubt what the reasonable medical standards were, that the defendant intentionally transgressed those standards, and that the complainant did not consent to the transgressions. Because the State did not meet this burden, defendant contends the evidence is insufficient to sustain a conviction for battery.

The State responds that the physician exemption does not apply to simple battery but only to those offenses specified in the statute. Moreover, the defendant bears the burden of proving he is entitled to the exemption and this defense was never raised at trial. The State is not required to anticipate and rebut an exemption when the defendant does not provide any evidence to show that the exemption applies. We agree with the State that the physician exemption does not apply.

Because this issue involves a determination on the applicability of the statute, it is a question of law and our standard of review is *de novo*. *Bowman v. American River Transportation Co.*, 217 Ill. 2d 75, 80, 838 N.E.2d 949, 952 (2005). The primary rule of statutory construction is to ascertain and give effect to the legislature's "true intent and meaning." *Bowman*, 217 Ill. 2d at 80, 838 N.E.2d at 952. We must also presume that when the legislature enacted a law, it did not intend to produce absurd, inconvenient or unjust results. *Progressive Universal Insurance Co. of Illinois v. Liberty Mutual Fire Insurance Co.*, 215 Ill. 2d 121, 134, 828 N.E.2d 1175, 1183 (2005).

The physician exemption is found in section 12–18(b) of the Criminal Code of 1961. 720 ILCS 5/12–18(b) (West 2006). The exemption provides that "[a]ny medical examination or procedure which is conducted by a physician, nurse, medical or hospital personnel, parent, or caretaker for purposes and in a manner consistent with reasonable medical standards is not an

offense under Sections 12–13, 12–14, 12–14.1, 12–15 and 12–16 of this Code." 720 ILCS 5/12–18(b) (West 2006). The specified sections cover criminal sexual assault, aggravated criminal sexual assault, predatory criminal sexual assault of a child, criminal sexual abuse, and aggravated criminal sexual abuse. 720 ILCS 5/12–13 through 12–16 (West 2006).

The exemption in section 12–18(b) applies to physicians, nurses, medical or hospital personnel, parents and caretakers. Section 12–18(b) does not define "physician." The definition of "physician" under the Medical Practice Act of 1987 includes a "chiropractic physician licensed to treat human ailments without the use of drugs and without operative surgery." 225 ILCS 60/2 (West 2006).

Defendant testified that he is a licensed chiropractor, that he is one class short of an undergraduate degree in biology, and that he completed his studies at the Chiropractic College at Los Angeles College of Chiropractic. He further testified that he is licensed by the State of Illinois to perform gynecological examinations, but that his office does not perform these examinations and he personally has never performed a gynecological examination.

For the exemption to apply, the physician must be conducting a medical examination or procedure. Although the parties have not raised this issue, we point out that it is questionable whether this particular massage would qualify as a medical examination or procedure.

Even if we were to adopt the definition of "physician" used in the Medical Practice Act and find that a chiropractor is a physician for purposes of section 12–18(b), and even if we were also to find that this particular massage was a medical procedure, the physician exemption does not apply to battery. Defendant argues that the legislature could not have intended for the

exemption only to apply if the State charges a felony sex offense and not misdemeanor charges like battery or disorderly conduct. We disagree.

A court's inquiry into the legislative intent behind a statute must necessarily begin with the language of the statute. *People v. Chandler*, 129 Ill. 2d 233, 253, 543 N.E.2d 1290, 1299 (1989). The Illinois Supreme Court has held that when the language of a statute is clear on its face, its meaning should be given effect without resort to supplementary statutory principles. *People v. Singleton*, 103 Ill. 2d 339, 341, 469 N.E.2d 200, 202 (1984).

Sections 12–12 through 12–18 are a group of statutes relating to criminal sexual conduct. Section 12–12 provides definitions, sections 12–13 through 12–16 detail specific offenses, section 12–17 contains defenses, and section 12–18 covers general provisions, including the physician exemption. In section 12–18(b), the legislature enumerated those sections to which the exemption applies, starting with section 12–13 and including every other section except section 12–16.2, criminal transmission of HIV.

The legislature did not include any type of offense, felony or otherwise, outside of the criminal sexual assault statutes in the exemption. It is clear from the enumeration of specific sections in the statute and the placement of the exemption within the group of statutes relating to criminal sexual conduct that the legislature intended to include specific charges for criminal sexual conduct in the exemption and exclude both misdemeanor and felony charges outside of the criminal sexual assault statutes.

In addition to the language of the statute, a court considers the legislative objective and the evil the statute seeks to remedy. *People v. Schwartz*, 64 Ill. 2d 275, 280, 356 N.E.2d 8, 10

(1976). The purpose of the exemption is to protect doctors who perform legitimate medical examinations from prosecution under the criminal sexual assault statutes. See *People v. Quinlan*, 231 Ill. App. 3d 21, 25, 596 N.E.2d 28, 31 (1992). Because criminal sexual conduct involves the touching of sex organs or the intrusion of an object into the sex organs, a doctor who must do these things as part of a legitimate medical examination is entitled to an exemption when prosecuted for one of the enumerated criminal sexual offenses.

However, a doctor who performs a medical examination is not entitled to an exemption for any other offense, including battery. If a doctor were to slap a patient during a medical examination, he or she would not be entitled to an exemption in a resulting battery charge. To interpret section 12–18(b) otherwise would be to presume the legislature intended an absurd result. The exemption only applies to the criminal sexual offenses specified in the statute.

Having found that the physician exemption does not apply, we now turn to defendant's general argument that the State's evidence was insufficient to prove defendant guilty beyond a reasonable doubt. When reviewing the sufficiency of the evidence of a criminal conviction, it is not this court's role to retry the defendant; rather, we determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2788-89 (1979); *People v. Ward*, 215 Ill. 2d 317, 322, 830 N.E.2d 556 (2005).

A person commits battery if he intentionally or knowingly without legal justification and by any means makes physical contact of an insulting or provoking nature with an individual. 720

ILCS 5/12–3(a)(2) (West 2006). The complaint alleged that Hayashi fondled Kelley's breasts and vagina during a chiropractic visit. Kelley testified that at various times during the massage, Hayashi touched and rubbed her breasts, vagina, labia and clitoris. Hayashi denied touching Kelley anywhere in her vaginal area at any time during the massage.

As the trier of fact, the trial judge is in a superior position to judge the credibility of the witnesses. *Buckner v. Causey*, 311 Ill. App. 3d 139, 144, 724 N.E.2d 95, 100 (1999). When contradictory testimony which could support conflicting conclusions is given at a bench trial, we will not disturb the trial court's factual findings based on that testimony unless a contrary finding is clearly apparent. *Buckner*, 311 Ill. App. 3d at 144, 724 N.E.2d at 100.

The trial court found the receptionist, Karen Muir, to be wholly incredible. The trial court further found that none of the other witnesses added much to the case. The only remaining witnesses were the complaining witness and the defendant.

Defense counsel said that Kelley had a motive to lie, but the trial court found that no evidence of such a motive had been presented. While noting the inconsistency in testimony regarding whether Kelley made her next appointment before or after the massage, the trial court stated it did not believe Kelley had any reason to lie about what happened during the massage and found her to be very credible. The court also found no evidence in the record to establish that Kelley consented to the touching of her breasts and vagina.

In contrast, the trial court found defendant to be incredible. The court said it did not believe defendant when he said this never happened. The trial court found that defendant knowingly, and without legal justification, made physical contact of an insulting nature with

15

1-07-1542

Kelley by fondling her breasts and vagina during a chiropractic visit.

We have examined the record to determine whether a contrary finding is clearly apparent. The record discloses that nobody else was in the room during the massage, or immediately before or after the massage. Hayashi did not testify to any legal justification for touching or rubbing Kelley's vagina. Instead, he denied ever touching Kelley's vagina, labia or clitoris. Kelley's account of the incident was both detailed and plausible, and the record discloses no apparent motive to lie. Kelley testified that she felt nervous and scared, but that she also trusted Hayashi and did not think she should question him. She further testified that she was embarrassed and afraid that if she said anything, he would just tell her that is how the massage is supposed to be done.

Both of the massage therapists testified that a full body massage does not include massaging the vaginal area, and one therapist also testified that it would only involve massaging the breasts if the patient complained of discomfort there. The massage therapists and Hayashi each acknowledged that they did not know of any massage point that could make the patient feel as if someone is touching or rubbing her vagina when the vagina is not actually being touched.

Because a contrary finding is not clearly apparent from the record, we will not disturb the trial court's credibility findings. We determine that, in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of battery to be proven beyond a reasonable doubt.

CONCLUSION

Based on the foregoing analysis, we affirm defendant's conviction for battery.

16

Affirmed.

O'BRIEN, P.J., and NEVILLE, J., concur.

1-07-1542

THE PEOPLE OF THE STATE OF ILLINOIS,

      Plaintiff-Appellee,

v.

BRADLEY HAYASHI,

      Defendant-Appellant.

No. 1-07-1542

Appellate Court of Illinois
First District, Fourth Division

October 30, 2008

JUSTICE GALLAGHER delivered the opinion of the court.

O'BRIEN, P.J., and NEVILLE, J., concur.

Appeal from the Circuit Court of Cook County.

Honorable Kay Marie Hanlon, Judge Presiding.

For APPELLANT, Dennis Doherty, Chicago, IL (Dennis Doherty, of counsel)

For APPELLEE, Cook County State's Attorney, Chicago, IL (Richard A. Devine, James E. Fitzgerald, Thomas M. Hardman, of counsel)